UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA BRADLEY,<br><br>        Petitioner,<br><br>    v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>        Respondent. | No. 1:17-cv-01322-GSA<br><br>**ORDER DIRECTING ENTRY OF<br>JUDGMENT IN FAVOR OF<br>COMMISSIONER OF SOCIAL SECURITY<br>AND AGAINST PLAINTIFF** |

I.  **Introduction**

     Plaintiff Rebecca Bradley ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

disability insurance benefits pursuant to Title II and supplemental security income under Title

XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs

which were submitted without oral argument to the Honorable Gary S. Austin, United States

Magistrate Judge.[1]  *See* Docs. 15, 18 and 19.  Having reviewed the record as a whole, the Court

finds that the ALJ's decision is supported by substantial evidence and complies with applicable

law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II.   Procedural Background

On August 11, 2014, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act. AR 17. The following day she filed a Title XVI application for supplemental security income. AR 17. In both applications, Plaintiff alleged disability beginning August 5, 2014. AR 17. The Commissioner denied the applications initially on January 16, 2015, and upon reconsideration on March 13, 2015. AR 17. On March 16, 2015, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 17.

Administrative Law Judge Robert Milton Erickson presided over an administrative hearing on April 14, 2016. AR 34-72. Plaintiff, represented by counsel, appeared and testified. AR 34. Impartial vocational expert Cathleen Spencer (the "VE") testified by telephone. AR 34.

On June 9, 2016, the ALJ denied Plaintiff's application. AR 17-29. The Appeals Council denied review on August 15, 2017. AR 1-3. On October 2, 2017, Plaintiff filed a complaint in this Court. Doc. 1.

## III.   Factual Background

### A.   Plaintiff's Testimony and Report

#### 1.   Hearing Testimony

Plaintiff (born September 18, 1962) had been working for Xerox for eight years when she began to experience difficulties at work. AR 58. Plaintiff explained that for three months "Nobody wanted to help me on the job, None of the supervisors. Nobody was talking to me." AR 58. In August 2014, Plaintiff's employers advised her that she was no longer performing adequately on the job. AR 57. However, Xerox did not fire Plaintiff. AR 57. Plaintiff explained:

> I had spent eight years doing everything they had asked me to do. Any schooling they sent me to. I worked any overtime. I did anything they asked me to without pay, and after doing this for eight years. The next day, when I was going to work, I just had, I just got fed up and I gave up Christmases, I gave up holidays with my family and all I did was work. I didn't do anything else. I gave up family and everything to work for them. So the next day, I just thought if I just got in my car and wrecked my car, I could just, I wouldn't have to go back there and I just wouldn't have to deal with anything anymore.

* * * * *

I didn't know what happened to me, but I just, just couldn't take it anymore and I just didn't see how they could do this to me.

AR 57.

Thereafter, Plaintiff was hospitalized for psychiatric treatment.  AR 40.

When Plaintiff was released from the hospital she was unable to afford private psychiatric care and received treatment from county mental health services.  AR 61.  Her treatment included psychiatric medications, therapy and counseling.  AR 59.  She had been seeing the same therapist for the six months just before the administrative hearing.  AR 61.

Although she retained her driver's license, Plaintiff last drove a car six months before the administrative hearing.  AR 40-41.  She depended on her friend or sister to drive her.  AR 59.  When she attempted to drive, or rode in a car with another driver, Plaintiff experienced panic attacks and wanted to escape the car.  AR 41-42.  Plaintiff also panicked on buses, and a goal of her therapy was to enable her to get on a bus.  AR 60.

Plaintiff was reluctant to talk to anyone other than her daughter.  AR 59.  She did not socialize or participate in activities outside her home, such as going to the movies.  AR 59.  Plaintiff had little contact with her children.  AR 43.  Although she texted with her daughter, she argued with her son who refused to allow her to visit her grandchildren.  AR 43.

Some days Plaintiff was unable to get out of bed or leave the house.  AR 60.  She forgot to take her medicine, shower and eat.  AR 60-61.  She picked at her skin until she bled.  AR 61.  Plaintiff had stopped consuming alcoholic beverages since using alcohol interfered with her medications.  AR 62.

At the time of the administrative hearing, Plaintiff lived in an apartment with a former boyfriend.  AR 43.  Her boyfriend let her move into a spare bedroom because she had nowhere else to go.  AR 43.  She was too tired to help him with household chores.  AR 44.  She sometimes accompanied her roommate to the grocery store but left quickly if the store was crowded or noisy.  AR 46.

///

3

### 2. Pain Questionnaire

In a pain questionnaire completed August 29, 2014, Plaintiff reported that for the past four years she had experienced fibromyalgia pain which she described as muscle stiffness and tender joints. AR 237. The pain was always present and was brought on by stress, exhaustion, fatigue, sleep disorder, depression and anxiety. AR 237. Plaintiff required a sleeping pill to rest and took amitriptyline HCl for pain.[2] AR 237. Medication did not fully relieve her pain and made her drowsy and unable to concentrate. AR 237-38.

### 3. Adult Function Report

Plaintiff's fibromyalgia caused very painful joints throughout her body with resulting depression, anxiety and fatigue. AR 240, 243. She had difficulty sleeping at night, slept about four hours during the day, and lacked the energy to drive or eat much. AR 241. Plaintiff did no household chores. AR 242. She had difficulty managing her finances. AR 243. Her impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands and get along with others. AR 245. She was unable to handle stress and change. AR 246. Authority figures did not understand her pain. AR 246. Plaintiff's medications included Topiramate, Zoloft, and amitriptyline HCl.[3]

### B. Mental Health Treatment

On August 7, 2014, Plaintiff was voluntarily admitted to the adult psychiatric unit at Good Samaritan Hospital, Bakersfield, California. AR 283. She reported having had suicidal ideation for the past three weeks and was unable to contract for safety.[4] AR 283. Her insight and

///

---

[2] Amitriptyline Hydrochloride is a tricyclic antidepressant with anticholinergic and sedative propertied. www.pubchem.ncbi.nlm.nih.gov/compound/Amitriptyline_hydrochloride (accessed February 12, 2019).
[3] Topiramate is used to prevent various types of seizures and to relieve the pain of migraine headaches. www.medlineplus.gov/druginfo/meds/a697012.html (accessed February 12, 2019). Zoloft (sertraline) is an antidepressant used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. www.medlineplus.gov/druginfo/meds/a697048.html (accessed February 12, 2019).
[4] "The contract for safety is a procedure used in the management of suicidal patients." Garvey, Keelin A. *et al*, "Contracting for Safety With Patients: Clinical Practice and Forensic Implications," J. Amer. Acad. Psych. & Law Online, vol. 37, No. 3 at 363-70 (Sept. 2009), reproduced at jaapl.org/content/37/3/363.long (accessed February 26, 2019). Also known as a no-suicide agreement, the contract for safety is used to assess suicidality and determine level of care. *Id.*

judgment were poor.  AR 283.  She did not initially disclose her suicide plan, which was later

identified as crashing her car.  AR 283.  Her diagnosis at admission was:

|  |  |
|---|---|
| Axis I: | 1. Major depressive disorder. |
|  | 2. Rule out posttraumatic stress disorder. |
| Axis II: | Deferred |
| Axis III: | Fibromyalgia, migraine, and C-section 32 years ago. |
| Axis IV: | Severe. |
| Axis V: | GAF 20. |

AR 283.[5]

By August 10, 2014, Plaintiff was alert and oriented with improving mood and congruent

affect, normal speech, linear thought process and acceptable sleep and appetite.  AR 284.  She

was able to contract for safety.  AR 284.  Her discharge diagnosis was:

|  |  |
|---|---|
| Axis I: | 1. Major depressive disorder. |
|  | 2. Rule out posttraumatic stress disorder. |
| Axis II: | Deferred |
| Axis III: | Fibromyalgia, migraine, C-section 32 years ago, leukopenia, hyperglycemia, and hypoglobulinemia. |
| Axis IV: | Severe. |
| Axis V: | GAF 40. |

AR 284.[6]

On August 14, 2014, Plaintiff had an initial appointment with psychiatrist Krishna

Vijayasarathi, D.O., at Truxton Psychiatric Medical Group.  AR 300-01.  Dr. Vijayasarathi noted

that although Plaintiff was more cheerful after hospitalization, she was still depressed and was not

sleeping well.  AR 300.  Plaintiff denied current suicidal ideation.  AR 300.  The doctor

prescribed Zoloft, Klonopin[7] and Restoril,[8] and entered the following diagnosis:

---

[5] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994).   A GAF of 11-20 corresponds to some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces or gross impairment in communication (e.g., largely incoherent or mute). *Id*.

[6] A GAF of 31-40 corresponds to some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id*.

[7] Klonopin is used alone or in combination with other medications to control certain types of seizures and to relieve panic attacks.  www.medlineplus.gov/druginfo/meds/a682279.html (accessed February 12, 2019).

[8] Restoril is used on a short-term basis to treat insomnia.  www.medlineplus.gov/druginfo/meds/a684003.html (accessed February 12, 2019).

5

Axis I:        Major depressive disorder.
               Generalized anxiety disorder social anxiety.
Axis II:       Deferred
Axis III:      Fibromyalgia, migraines.
Axis IV:       Moderate
Axis V:        GAF 60.

AR 301.[9]

On August 21, 2014, psychiatrist Iyengar Malini, M.D., saw Plaintiff at Truxton Psychiatric Medical Group. AR 299. Plaintiff reported anxiety when she went out anywhere. AR 229. When Plaintiff reported that Restoril was not helping her sleep, Dr. Malini suggested that she try taking Benadryl at bedtime. AR 299. Although Plaintiff denied suicidal thoughts, the doctor observed depressed and flat affect with social anxiety and tears. AR 299. Dr. Malini recommended counselling in addition to medications. AR 299.

When Plaintiff met with Dr. Malini on September 4, 2014, Plaintiff was still isolating herself and not driving. AR 298. She continued to have bad dreams. AR 298. Plaintiff was anxious with blunt affect. AR 298. Dr. Malini increased Plaintiff's Zoloft prescription and again encouraged her to see a counselor. AR 298.

Plaintiff's condition was little changed when she next saw Dr. Malini on September 25, 2014. AR 297. Dr. Malini added a prescription for Abilify.[10] AR 297.

On October 8, 2014, Plaintiff had not yet taken Abilify, reporting that she forgot. AR 296. She was frustrated and tired and reported that talking to people at work made her angry. AR 296. She had not begun counselling. AR 296.

On October 17, 2014, Plaintiff began medication management with psychotherapy with Asarulislam Syed, M.D., at Omni Family Health. AR 332-34. Dr. Syed described the history of Plaintiff's illness as follows:

---

[9] A GAF score from 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders* at 32-35.

[10] Among other uses, Abilify (aripiprazole), an atypical antipsychotic, is prescribed to treat depression when anti-depressive medications alone have not controlled symptoms. www.medlineplus.gov/druginfo/meds/a6033012.html (accessed February 12, 2019).

The symptoms are reported as being moderate. The symptoms occur constantly. PATIENT reports doing POORLY ON current regimen. COMPLAINS OF AUDITORY HALLUCINATIONS. NO Akathisia noted. Patient has below average grooming, is passively interactive, exhibits some apathy and has passive and indifferent attitude. Speech is of a normal rate and tone. Thought processes show some thought blocking but are fairly goal directed. Ambivalence noted. Is passively communicative and shows little spontaneity. There is obvious thought blocking and some distractibility is noted. There is no flight of ideas or loosening of associations. Thought content reveals no delusions. There is a marked poverty of thought content. Has a past history of Auditory Hallucinations. No command hallucinations present. There is no evidence of any grandiosity. No evidence if any morbid preoccupation. Cognition is fairly intact. Working memory, GOOD.

AR 332.

Dr. Syed diagnosed schizoaffective disorder and generalized anxiety disorder and stated that her current GAF was 50.[11] AR 333.

On December 5, 2014, Plaintiff complained of depression and irritability on most days. AR 327. Rapid mood changes impaired occupational functioning and interpersonal relationships. AR 327. Dr. Syed added a diagnosis of insomnia due to mental disorder. AR 328.

On January 12, 2015, Dr. Syed opined that Plaintiff was doing poorly on the current regimen. AR 324. She complained of Akathisia and had stopped Risperdal, but Dr. Syed observed no involuntary movements during the exam. AR 324. Plaintiff's grooming was again below average, and she was passively interactive with a passive and indifferent attitude. AR 324. The doctor observed ambivalence, passive communication, little spontaneity, obvious thought blocking and distractability. AR 324. Dr. Syed discontinued Plaintiff's Risperdal prescription and added Geodon,[12] trazodone[13] and temazepam.[14] AR 325.

On March 3, 2015, Plaintiff began individual psychotherapy sessions with Sara Thomas Chandler, L.C.S.W., with the goal of learning to recognize, accept and cope with her depression.

---

[11] A GAF of 41-50 corresponds to serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* at 32-35.

[12] Geodon (Ziprasidone) is an atypical antipsychotic used to treat symptoms of schizophrenia and bipolar disorder. www.medlineplus.gov/druginfo/meds/a699062.html (accessed February 12, 2019).

[13] Trazodone is an antidepressant. www.medlineplus.gov/drugonfo/meds/a681038.html (accessed February 19, 2019).

[14] Temazepam is prescribed on a short-term basis for insomnia. www.medlineplus.gov/drugonfo/meds/a684003.html (accessed February 19, 2019).

AR 417-22.  Plaintiff also sought to handle her anger more effectively.  AR 419.  She reported poor relations with family members because she always tells the truth.  AR 419.  Plaintiff told Ms. Chandler that she did not want to find work.  AR 420.

On March 6, 2015, Plaintiff told Dr. Syed that she was experiencing depression and irritable mood on most days with rapid mood changes that disturbed occupational functioning and interpersonal relationships.  AR 414.  Sleep and appetite remained poor.  AR 414.

When she saw Dr. Syed on April 20, 2015, Plaintiff reported severe symptoms.  AR 411.  Her issues included polypharmacy and doctor shopping.  AR 411.  She was accompanied by a male friend who had good insight and sought to help Plaintiff.  AR 411.

On May 5, 2015, Plaintiff again saw Ms. Chandler.  AR 408-10.    On June 2 and August 3, 2015, Plaintiff reported moderate symptoms to Dr. Syed.  AR 402-07.

Although Plaintiff's October 1, 2015, session with Ms. Chandler was to focus on improving the symptoms of anxiety and schizoaffective disorder that were impairing Plaintiff's daily functioning, Plaintiff reported that she visited her son and daughter-in-law in Los Angeles, who called police.  AR 399.  The session focused on Plaintiff's lack of understanding why she was asked to leave her son's home.  AR 399.  Ms. Chandler noted no significant change in Plaintiff's symptoms, and that Plaintiff had no support network.  AR 399-400.

On October 5, 2015, Plaintiff told Dr. Syed of recent arguments with the boyfriend with whom she was living. AR 395.  Her boyfriend was present at the session.  AR 395.  Plaintiff complained that her boyfriend did not seem to understand her depression, anxiety and habit of picking at her skin.  AR 395.  When Plaintiff next saw Dr. Syed on November 16, 2015, she had moved from her boyfriend's home and begun living with her friend Charlene, who was present at the appointment.  AR 392.

On January 12, 2016, Ms. Chandler noted that after cohabitating for eight years, Plaintiff's boyfriend had recently asked her to move out.  AR 389.  Plaintiff was sad and angry but feeling better in new housing with a friend from church.  AR 389.  Plaintiff wanted to reconcile with her son and see her grandchildren, but her son refused.  AR 389.

///

8

On February 29, 2016, Dr. Syed noted moderate anxiety and depression.  AR 382.

Plaintiff had a fair ability to concentrate but was sad and low on most days with low energy level.

AR 382.  Her sleep remained interrupted and not restful.  AR 382.

Medical opinions of Plaintiff's mental residual functional capacity are included in Section

VII below.

### C.    **Physical Medical Treatment and Opinions**

On January 16, 2015, agency physician Judy Panek noted that Plaintiff's fibromyalgia

caused pain throughout her body including muscle stiffness and tender joints.  AR 81.  Dr. Panek

opined that Plaintiff retained the residual functional capacity to lift and carry twenty pounds

occasionally and ten pounds frequently; sit, stand and walk about six hours in an eight-hour day;

had unlimited ability to push and pull but with upward pulling limited to twenty pounds.  AR 82.

Postural limitations included occasional stooping, kneeling, crouching, crawling and climbing

ramps, stairs, ladders, ropes or scaffolds.  AR 82.  Plaintiff could frequently balance and had no

manipulative, visual, or communicative limitations.  AR 82.  She should avoid concentrated

exposure to vibrations and hazards such as machinery and heights.  AR 83.  On reconsideration,

agency physician K. Quint, M.D., concurred with Dr. Panek's physical assessment.  AR 119-22.

The administrative record also includes a medical consultative opinion from internist John

Sedgh, M.D., who addressed Plaintiff's allegations of fibromyalgia and bilateral hand, elbow and

foot pain.  AR 309-14.  A physical residual functional capacity questionnaire from Jonathan E.

Akannio, M.D., appears at AR 361-62.  The record does not identify Dr. Akannio's professional

relationship, if any, with Plaintiff.  Treatment notes for Plaintiff's physical impairments appear at

AR 363-78.

### IV.    **Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

Commissioner denying a claimant disability benefits.  "This court may set aside the

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

legal error or are not supported by substantial evidence in the record as a whole." *Tackett v.*

*Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.   **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had

medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 17-29. The ALJ found that Plaintiff had not worked since the alleged onset date of August 5, 2014. AR 19. Plaintiff had the following serious impairments: schizoaffective disorder, anxiety disorders and fibromyalgia. AR 19. The severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526; 416.920(d); 416.925; 416.926). AR 20.

The ALJ concluded that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except that she is capable of simple repetitive tasks, occasional detailed complex tasks, no high production goals and can maintain concentration for a two-hour period. AR 21-22. Plaintiff was unable to perform any past relevant work. AR 27. Transferability of skills was not an issue since Plaintiff, an individual closely approaching advanced age, would be found not disabled under the Medical Vocational Rules (the "grids") whether or not she had transferable skills. AR 28. Claimant could perform jobs existing in significant numbers in the national economy. AR 28. Accordingly, the ALJ found that Plaintiff was not disabled from the alleged onset date of August 5, 2014, through June 9, 2015, the date of the hearing decision. AR 29.

## VII.     The ALJ Properly Evaluated the Medical Evidence

Plaintiff contends that the ALJ erred in rejecting the opinions of the state agency physicians in favor of the opinion of Dr. Riahinejad, an examining physician. The Commissioner responds that the ALJ properly favored Dr. Riahinejad's opinion which was consistent with the

///

evidence as a whole. The Court concludes that the ALJ's analysis of psychological opinion was not reversible error.

### A. Medical Opinions Concerning Plaintiff's Mental Impairments

#### 1. Agency Physicians

On January 12, 2015, agency psychologist Leif Leaf, Ph.D., identified Plaintiff's medically determinable impairments as fibromyalgia, spinal disorders, anxiety disorders and affective disorders. AR 79-80. Dr. Leaf conducted the psychiatric review technique and determined that Plaintiff's mental health impairments resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and, one or two episodes of decompensation, each of extended duration. AR 79. He opined:

> The claimant is limited for ADL's from her physical pain. She completes self care and basic HH chores. She doesn't like being around too many people. She can follow directions, and pay attention for simple tasks.
>
> The claimant was inpatient in 8/2014 for SI. She stabilized and diagnosed with MDD. A 1/3/15 mental CE finds her alert, oriented and cooperative. She is diagnosed with PTSD, Depression with a GAF of 60. She was able to complete simple, routine tasks with some limits for adapting to workplace stress.
>
> AR 80.

In Dr. Leaf's opinion, Plaintiff was not significantly limited in the ability to remember locations and work-like procedures; understand, remember and carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerance; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places; use public transportation; set realistic goals;

and make plans independently of others. AR 84-85. Plaintiff had moderate limitations in her ability to understand; remember and carry out detailed instructions; maintain attention and concentration for long periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the public; and, respond appropriately to changes in the work setting. AR 84-854.

On reconsideration, agency psychologist Timothy Schumacher, Ph.D., concurred with Dr. Leaf's mental assessment. AR 114-16.

## 2. <u>Psychiatric Consultative Opinion</u>

On January 3, 2015, psychologist Ahmad S. Riahinejad, Ph.D., conducted a consultative examination for the state agency. AR 302-06. In addition to examining Plaintiff, Dr. Riahinejad reviewed Plaintiff's adult disability report (SS Form 3868) and the discharge summary from Good Samaritan Hospital. AR 303. He administered a mini mental status examination noting that Plaintiff could not perform serial sevens but could perform serial threes, and could remember one of three objects in five minutes, remain on topic in conversation and respond to questions immediately. AR 304. Plaintiff could add and subtract but could not multiply and divide. AR 304. Her interpretation of proverbs was impaired. AR 304. Dr. Riahinejad diagnosed:

> Axis I:     Post traumatic stress disorder.
>             Depressive disorder with anxiety.
> Axis II:    No diagnosis.
> Axis III:   Fibromyalgia and migraine headaches, deferred to specialist.
> Axis IV:    Psychosocial stressors: moderate.
> Axis V:     GAF: 60.

AR 305.

The doctor opined that Plaintiff could handle funds on her own behalf. AR 305. She had no limitations in her ability to follow simple and oral instructions; interact with the public, coworkers and supervisors; comply with job rules such as safety and attendance; and, respond to changes in a routine work setting. AR 305. Plaintiff's ability to focus and sustain attention was mildly limited. AR 305. She was moderately limited in her ability to follow detailed instructions and to respond to work pressure in a usual work setting. AR 305.

### 3. **Medical Source Statement (Mental)**

Dr. Syed completed a medical source statement on March 7, 2016. AR 379-81. He opined that Plaintiff had extreme limitations in the ability to respond appropriately to work pressures in a usual work setting. AR 380. Plaintiff had marked difficulty in understanding, remembering and carrying out both short, simple instructions and detailed instructions, and in responding appropriately to changes in a routine setting. AR 379-80. She had moderate difficulty in the ability to make judgments on simple work-related decisions and to interact appropriately with the public, supervisors and co-workers. AR 379-80. To support his opinions, Dr. Syed referred the reader to his progress notes. AR 379-80.

### B. **The ALJ's Determination of Plaintiff's Residual Functional Capacity**

At step three, the ALJ determined that Plaintiff's severe mental impairments, schizoaffective disorder and anxiety disorders, did not meet or medically equal the criteria of listings 12.04 or 12.06. AR 21. He found that Plaintiff had mild restriction in activities of daily living, no difficulties in social functioning, moderate difficulties in concentration, persistence and pace, and no episodes of decompensation which had been of extended duration. AR 21. Accordingly, Plaintiff could not satisfy the paragraph B criteria of the regulations, which require at least two marked restrictions of the first three categories or one marked restriction combined with repeated episodes of decompensation. AR 21. Nor did Plaintiff satisfy the paragraph c criteria of either listing. AR 21. The ALJ noted that the subsequent detailed analysis of Plaintiff's residual functional capacity would reflect the degree of limitation determined at step three. AR 21.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that she was capable of constant simple repetitive tasks, occasional detailed complex tasks, and no high production goals. AR 21-22. Plaintiff could maintain concentration for two hours. AR 22.

The ALJ began his analysis with a detailed review of the treatment notes included within the record before he concluded that despite her severe impairments, Plaintiff could perform a limited range of medium work. AR 22-25. The ALJ wrote:

> Psychiatrically, the record makes some mention of depressed and tearful mood, constricted affect, below average grooming, anhedonia, passive and indifferent attitude, circumstantial thought process, distractibility, some thought blocking, marked poverty of thought content, some flight of ideas and loosening of associations, interrupted sleep and non-restful sleep, poor appetite and low energy level. Objective observations on mental status evaluation were otherwise generally within normal limits, however, including good eye contact, no flight of ideas or loosening of associations, full orientation, well groomed, improving mood, normal affect and speech, cooperative behavior, pleasant attitude, normal thought content, goal-directed thought process, intact cognition, good working memory, good concentration abilities, and fair insight/judgment. She denied having suicidal thoughts, hallucinations or paranoia.

AR 25 (citations to record omitted).

The ALJ also found that Plaintiff was capable of independent personal care, could prepare simple meals, shop in stores and by phone, read, watch television, and travel in cars with others. AR 25. Although Plaintiff was not always compliant with her doctors' directions and sometimes missed or failed to make appointments, when appropriate medications were taken as directed, they were effective in controlling Plaintiff's symptoms. AR 26.

The ALJ gave "full weight" to Dr. Riahinejad's diagnosis and consultative opinion because Dr. Riahinejad had examined Plaintiff and articulated opinions that were consistent with his clinical findings. AR 26. He wrote: "Dr. Riahinejad opined that the claimant's ability to follow simple and oral instructions is not limited; ability to follow detailed instructions was moderately limited; ability to interact with the public, coworkers and supervisors, comply with job rules, respond to changes in a routine work setting were not limited; ability to respond to work pressure in a usual work setting was moderately limited and ability to focus and sustain attention was mildly limited." AR 26. The ALJ gave some weight to the opinions of the state agency psychologists, Leif Leaf, Ph.D., and Timothy Schumacher, Ph.D., since they were generally consistent with Dr. Riahinejad's opinions, but gave greater weight to Dr. Riahinejad's opinion since he had examined Plaintiff. AR 27. In contrast, the ALJ gave "little weight to the marked and extreme limitations given by Dr. Syed because they [we]re inconsistent with progress notes that describe the claimant as being moderate." AR 26.

///

## C.    Applicable Law

The ALJ's analysis was generally consistent with law generally applicable when analyzing medical opinions to determine a claimant's residual functional capacity.  The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  In this case, the ALJ gave little weight to Dr. Syed's opinion since it was not consistent with his treatment notes.  Plaintiff does not challenge the ALJ's assessment of Dr. Syed's opinion.

Plaintiff contends that the ALJ erred in favoring Dr. Riahinejad's opinion over those of the agency psychologists.  However, her position on this point is contrary to generally applicable law.  The opinion of an examining physician is generally entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for clear and convincing reasons.  *Lester*, 81 F.3d at 831.

In contrast, the opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  Such independent reasons may include laboratory test results, contrary reports from examining physicians, and Plaintiff's testimony when it conflicts with the treating physician's opinion.  *Lester*, 81 F.3d at 831, citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  In this regard the ALJ did not err in giving less weight to the nonexamining psychologist's opinions than that of the examining physician.

Nonetheless, Plaintiff contends that the ALJ should have concluded that the state agency psychologists' analysis was more consistent with later evidence.  She emphasizes her limitations in certain areas of the mini mental status exam, and contends that an opinion that she is capable of simple tasks is ambiguous.  As is always the case in an appeal of the Commissioner's denial of disability benefits, Plaintiff would construe the evidence differently than the ALJ.  However,  the

ALJ's analysis complied with the legal principles set forth above which guided his analysis of the evidence in this case. Even if the evidence could arguably support Plaintiff's interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

## VIII.   The ALJ Did Not Err at Step Five

### A.   The Parties' Contentions

Relying on Social Security Ruling 82-41 and *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009), Plaintiff contended in her opening brief that the ALJ erred by failing to identify Plaintiff's transferable skills at step five of the disability analysis. Doc. 15 at 8-9. The Commissioner responded that the vocational expert's testimony appropriately tied Plaintiff's residual functional capacity to a specific vocation preparation (SVP) level. Doc. 18 at 9-12. Because the parties' arguments failed to consider the Ninth Circuit Court's opinion in *Barnes v. Berryhill*, 895 F.3d 702 (9th Cir. 2018), which under similar facts reversed an ALJ's determination and remanded the case for further administrative proceedings to address Plaintiff's transferable skills, the Court requested that the parties submit supplemental briefs addressing the application, if any, of *Barnes* to this case. Doc. 21.

In her supplemental brief, Plaintiff contended that the ALJ was required to identify her transferable skills as part of the analysis determining whether Plaintiff retained the ability to work despite her non-exertional impairments. Doc. 22 at 4. Defendant countered that because Plaintiff could no longer do her past relevant work, which was skilled, the ALJ appropriately concluded that Plaintiff could perform the semi-skilled jobs identified by the vocational expert. Doc. 25 at 4. According to Defendant's construction of SSR 82-41, findings of transferability were immaterial because "'transferability of work skills is at issue' only when transferability from past work is the 'decisive' issue between the Grid[']s directing a finding of disabled or not disabled, which occurs 'in only a relatively few instances.'" Doc. 25 at 5. The Court agrees with the Commissioner's contentions.

///

///

### B.   Vocational Expert Testimony and the ALJ's Decision

17

Vocational expert Cathleen Spencer identified Plaintiff's past relevant work as user support analyst (DOT No. 032.262-010, SVP 7, DOT and performance at sedentary); user support analyst supervisor (DOT No. 032.132-010, DOT at SVP 8, performed at SVP 6, DOT and performance at sedentary); customer complaint clerk (DOT No. 241.367-014, SVP 5, DOT and performance at sedentary); and apartment house manager (DOT No. 186.167-018, SVP 5, DOT at light, performed at medium).[15]  AR 65-66.  The first hypothetical question concerned an individual with the same residual functional capacity as that eventually found for Plaintiff.  AR 66-67.  Ms. Spencer opined that the hypothetical person could not perform any of Plaintiff's past relevant work because she was limited to occasional detailed and complex task duties.  AR 67.  The hypothetical person could work as a receptionist (DOT No. 237.367-038, SVP 4, sedentary, 102,000 jobs available nationally); telephone solicitor (DOT No. 299.357-014, SVP 3, sedentary, 162,000 jobs available nationally); and general clerk (DOT No. 209.562-010, SVP 3, light, 49,000 jobs available nationally).[16]  AR 67.

In the hearing decision dated June 9, 2016, the ALJ adopted the vocational expert's opinion that Plaintiff was unable to perform her past relevant work.  AR 28.  In conducting the step five analysis, he found that Plaintiff was 51 years old on the alleged disability date placing her in the category of an individual closely approaching advanced age.  AR 28.  She had a high school education and was able to communicate in English.  AR 28.  The ALJ found that "[transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)."  AR 28.  The ALJ concluded that jobs that Plaintiff could perform existed in significant numbers in the national economy.  AR 28-29.

///

## C.    The Step Five Analysis

---

[15] All of Plaintiff past relevant work was skilled.  *See* S.S.R. 00-4p, 2000 WL 1898704 at * 3 (2000); *Migala v. Berryhill*, 2018 WL 1989550 at *3, n. 1 (N.D. Cal. March 14, 2018) (No. 17-cv-00482-EDL).
[16] All of the exemplary available jobs were semi-skilled.  *See* S.S.R. 00-4p, 2000 WL 1898704 at * 3 (2000); *Migala*, 2018 WL 1989550 at *3, n. 1.

At step five, the ALJ has the responsibility to determine a claimant's skills, levels of skills and potential occupations to which skills from the claimant's past relevant work may be transferred. SSR 82-41 at *4. The Social Security Administration introduced the Medical Vocational Guidelines to reduce the need for a vocational expert to analyze the number of jobs available to each claimant based on that claimant's physical ability, age, education and work experience. *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The Grids direct a conclusion of whether jobs requiring specific combinations of these four factors exist in significant numbers in the national economy. *Id.* at 461-62. If the Grids determine that work exists for a claimant, the claimant is not considered disabled. *Id.* at 462. Establishing Medical-Vocational Guidelines was intended to promote uniformity and efficiency in a system sometimes criticized for its inconsistent treatment of similarly situated claimants. *Id.* at 461.

Relying solely on the Grids is inappropriate, however, when the claimant has significant non-exertional limitations. *Barnes*, 895 F.3d at 706. In the above-captioned case, the ALJ found that because of Plaintiff's non-exertional limitations, the Grids served only as a framework for further analysis of the effects of the non-exertional limitations. AR 28. As detailed above, the parties disagree whether an ALJ was required to make findings and consider transferability of skills. The Court concludes that the ALJ was not required to make specific findings about Plaintiff's transferable skills because Plaintiff was not of advance age and her non-exertional findings were not so significant as to require deviation from the grid rules.

An ALJ may use the grids even when a claimant has both exertional and non-exertional limitations, so long as the non-exertional limitations do not significantly impact the exertional capabilities. *Bates v. Sullivan*, 894 F.2d 1059, 1063 (9th Cir. 1990), *overruled on other grounds*, *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991); *Rogers v. Colvin*, 970 F.Supp.2d 1147, 1160-61 (W.D. Wash. 2013). "[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids." *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 577 (9th Cir. 1988). The ALJ must first determine that that claimant's non-exertional limitations do not significantly limit the range of work permitted by his exertional limitations. *Id.*; *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007); *Tackett*, 180 F.3d at 1101. "[T]he

Grids can never direct a conclusion of not disabled for a claimant with significant additional limitations not contemplated by the Grids." *Barnes*, 895 F.3d at 706. "[I]f an ALJ determines that a claimant's nonexertional limitations do not significantly affect his ability to perform a full range of work, then use of the grids is appropriate." *Tackett*, 180 F.3d at 1101. Mild or moderate depression does not establish a "sufficiently severe non-exertional impairment" to preclude reliance on the grids at step five or to require vocational expert testimony. *Myers v. Colvin*, 954 F.Supp.2d 1163, 1176 (W.D. Wash. 2013) (citing *Hoopai*, 499 F.3d at 1075).

In Plaintiff's case, the ALJ did not find that Plaintiff's non-exertional impairments constituted significant impairments. He gave full weight to the opinion of the consultative examiner Dr. Riahinejad, who opined that Plaintiff had (1) no limitations in her ability to follow simple and oral instructions; interact with the public, coworkers and supervisors; comply with job rules such as safety and attendance; and, respond to changes in a routine work setting; mild limitations in her ability to focus and sustain attention; and, moderate limitations in her ability to follow detailed instructions and to respond to work pressure in a usual work setting. AR 26, 305. The ALJ also gave some weight to the agency physicians whose opinions were consistent with Dr. Riahinejad's opinion. AR 27. The ALJ rejected the opinion of treating physician Dr. Syed that Plaintiff had marked and extreme limitations as inconsistent with Dr. Syed's treatment notes describing Plaintiff's limitations as moderate. AR 26.

When the grids do not match the claimant's qualifications, the ALJ may either (1) use the grids as a framework to determine what work the claimant can perform or (2) rely on a vocational expert to establish the availability of suitable jobs in the national economy. *Hoopai*, 499 F.3d at 1075; *Tackett*, 180 F.3d at 1102. At step five, the ALJ bears the burden of proving that the claimant can perform a significant number of other jobs available in the national economy. *Hoopai*, 499 F.3d at 1074. To meet that burden, the ALJ must "identify specific jobs existing in substantial numbers in the national economy that [the] claimant can perform despite [his or her] identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)); *Best v. Astrue*, 580 F.Supp.2d 975, 981 (C.D. Cal. 2008). Vocational expert testimony may be necessary to provide substantial evidence to support

the ALJ's reliance on the grids in the face of non-exertional limitations that are not severe. *Myers*, 954 F.Supp.2d at 1178. In this case, the ALJ correctly used the grids as a framework for his decision but relied on the vocational expert's testimony that sufficient jobs were available in the national economy that Plaintiff could perform.

**IX.** **Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Rebecca Bradley.

IT IS SO ORDERED.

Dated:   **May 14, 2019**                    **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE